LAW FIRM OF WILLIAM KOY, L.L.P.
Attorneys for Plaintiff
89 Headquarters Plaza
North Tower, Twelfth Floor
Morristown, New Jersey 07960
(973) 993-1755
Facsimile:  (973) 993-1754

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAVINO CAPILUPI<br><br>*Plaintiff,*<br><br>—vs—<br><br>THE TOWNSHIP OF MIDDLETOWN, SGT. GERALD WEIMER, SGT. PATRICIA COLANGELO AND LT. PAUL BAILEY, AS INDIVIDUALS<br><br><br>*Defendants.* | CIVIL ACTION NO.<br>BEFORE THE HONORABLE<br><br><br><u>VERIFIED COMPLAINT AND<br>DEMAND FOR TRIAL BY JURY</u> |

Plaintiff, **SAVINO CAPILUPI,** by way of this Complaint against the above named Defendants hereby states:

### *GENERAL ALLEGATIONS*

1.  This is an action in which the Plaintiff seeks relief for the violation of rights guaranteed under the laws and Constitution of the State of New Jersey and under the laws and Constitution of the United States.

2.  Plaintiff seeks declaratory relief, injunctive relief, and money damages to redress the injury

**Page <1>**

and deprivation of rights guaranteed by the United States Constitution and the laws and Constitution of the State of New Jersey caused to the Plaintiff by the unconstitutional and unlawful acts of defendants under color of state law and pursuant to official policy, practice, custom or usage, and caused further by a conspiracy to violate said Plaintiff's civil rights by engaging in a course of conduct to harass and retaliate against the Plaintiff, without any legal basis or justification, for the Plaintiff's exercise of lawfully protected rights all of which has caused and continues to cause irreparable damage and injury to the Plaintiff.

### *JURISDICTION*

3. Jurisdiction is invoked herein pursuant to 28 U.S.C. Sections 1331 and 1343 (3) and (4) this being an action seeking redress for the violation of the Plaintiff's constitutional and civil rights.

4. The value of the rights which were violated herein and which continue to be violated is in excess of ten thousand dollars ($10,000.00) exclusive of interest and costs.

5. Jurisdiction is invoked herein in conjunction with the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Section 1983 and 1988.

6. Jurisdiction is also invoked in conjunction with the **Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202**, this being an action in which the Plaintiff seeks declaratory and injunctive relief as well as monetary damages.

7. The Plaintiff requests that this Court exercise its discretion and invoke pendent jurisdiction over any and all state law claims and causes of actions which derive from the same nucleus

**Page <2>**

of operative facts that give rise to the federally based claims and causes of actions.

8.      The Plaintiff demands a trial by jury on each and every one of his claims as pled herein.

### *PARTIES*

9.      Plaintiff, **Savino Capilupi ("Plaintiff")**, is a citizen of the United States and a resident of Highlands, County of Monmouth, State of New Jersey.

10.     Defendant, **Township of Middletown ("Middletown"),** is a political subdivision of the State of New Jersey, County of Monmouth, organized under the laws of the State of New Jersey.

11.     Defendant, **Gerald Weimer,** at all times relevant herein, was the Sergeant for the Middletown Police Department, and as such, responsible for promulgating and implementing policies, practices and procedures.

12.     Defendant, **Patricia Colangelo**, at all times relevant herein, was FTO and Sergeant for the Middletown Police Department, and as such, responsible for promulgating and implementing Department policies, practices and procedures.

13.     Defendant, **Paul Bailey**, at all times relevant herein, was the Sergeant, now Lieutenant of the Middletown Township Police Department, and as such, responsible for promulgating and implementing Department policies, practices and procedures.

### *ALLEGATIONS OF FACT*

14.     In or about March 2010, Plaintiff was singled out to his detriment, which has continued to the present, for his application and usage of sick and personal days, a benefit he had received from the Township.

**Page <3>**

15. On March 25, 2010, Plaintiff was ill and needed to call out sick due to a severe headache that was getting progressively worse. Sgt. Bailey, inappropriately and wrongly, reprimanded Plaintiff for attempting to use this contractual benefit.

16. Afterwards, Plaintiff spoke out about this to his direct supervisors, his Union, and his fellow co-workers, thus sparking Sgt. Bailey to grow more angry, resentful and retaliatory towards him.

17. From that point in time, Sgt. Bailey has singled out Plaintiff, to his detriment, as well as transferring his hostilities toward Plaintiff to his close allies, Sgt. Weimer and Sgt. Colangelo, who were assigned as Plaintiff's supervisors. The pattern of harassment now was continuing.

18. Important to note as a historical item, early on, in 2008, Sgt. Colangelo "soured" on Plaintiff. When Plaintiff was in his third month of Field Training, November 2008, then, Patrol Officer/FTO Colangelo (now Sgt. Colangelo) was assigned as Plaintiff's Field Training Officer (FTO).

19. At the end of the month they spent together, the time came for their meeting with Deputy Chief Braun, as Plaintiff reached the end of the traditional 3 month Field Training Program.

20. To Plaintiff's surprise, when asked by Deputy Chief Braun if he was ready to go out on the road alone, FTO Colangelo stated that she thought Plaintiff needed a few more weeks with her to fine tune certain things.

21. Then, Deputy Chief Braun asked Plaintiff what he thought about it and if he felt he was ready. Plaintiff proceeded to say something to the effect of , "With no disrespect intended

**Page <4>**

to FTO Colangelo, he felt he was ready; the only way he can truly sharpen up certain points is to get out there and do it."

22. Deputy Chief Braun agreed with Plaintiff and authorized him to go out on Patrol without an FTO.

23. FTO Colangelo was visibly sour about this although she didn't verbalize anything at that time. Moving forward, from their meeting with Deputy Chief Braun, Plaintiff's time spent with FTO Colangelo in field training was not of a confidential or classified nature. Plaintiff openly spoke about this experience with co-workers who were not surprised about FTO Colangelo's style and many were empathetic to Plaintiff.

24. It became known throughout the department about Plaintiff's experience with FTO Colangelo, even to the point where new hires that were assigned to her, would approach Plaintiff for advice.

25. Then, when Sgt. Colangelo was assigned to his squad as a new Sergeant, May 2013, this assignment was clearly to the detriment of Plaintiff.

26. As a bona fide member of his PBA, Plaintiff would assess issues at hand, and, if necessary, would speak out at Union Meetings. Plaintiff is well known for speaking out within this forum, encouraging the Union leadership and membership to fight against the Township's proposed provision in the next labor contract to restrict the number of personal days that can be taken on the major holidays to two officers per squad, per holiday shift.

27. During the mandatory union meeting of April 25, 2011, Plaintiff stood up and expressed his views therein. Previously, the number of officers that could take personal days on holidays

**Page <5>**

was not restricted. Although this new provision was proposed by the Township to "reduce overtime costs", Plaintiff stated that the use of personal days almost always causes overtime and is used by officers when they are unable to get traditional leave due to other officers' previous requests for leave. Furthermore, Plaintiff stated that, as a family man with a wife and child, he preferred to use his personal days on holidays rather than other events such as the "Super Bowl" or on a nice summer weekend, when standard leave is already spoken for since the use of the personal day on the holiday causes no more annual overtime expense to the Township, versus taking a personal day on a non-holiday shift. Plaintiff further stated that there were always an abundance officers signing up on posted sheets to fill possible overtime spots on the holidays, thus staffing has not and would not be an issue.

28. Important to note is that nearly all the non-administrative supervisors in the department (Sergeants and Lieutenants) were in attendance at this, and other PBA meetings. It was obvious that Plaintiff's comments sparked resentment from soon to be promoted senior officers and the current supervisory ranks, including Sgt. Bailey.

29. It was Sgt. Bailey who regularly touted against the use of personal days on holidays by junior officers. He often stated that there was a "Gentleman's Agreement" in place where it was understood that junior officers would not take personal days on holidays, although there was no such mention of it in the current contract at the time and such use is a bona fide contractual benefit of all members.

30. From that point in time, Sgt. Bailey has singled out Plaintiff, to his detriment, as well as transferring his hostilities toward Plaintiff to his close allies, Sgt. Weimer and Sgt.

**Page <6>**

Colangelo, who became Plaintiff's direct supervisors.

31.    Plaintiff has also been negatively singled out for his use of his "Rebuttal" comments as to his Performance Evaluations.

32.    Beginning with Plaintiff's January through June 2012 Performance Evaluation, Plaintiff was at the Officer In Charge (OIC) Desk, having submitted to Lt. John Kaiser his written comments to one particular section of the review where Sgt. Sean Sweeney had noted an issue with the volume of number of arrests and motor vehicle summonses issued.

33.    While standing there waiting for Lt. Kaiser's feedback on what Plaintiff wrote as a Rebuttal, within the Employee Comments section, namely the fact that he was assigned a steady midnight shift in the most quiet section of town (Lincroft area), as opposed to working on the north side of town (highest volume of crime and containing Route 36).  Sgt. Bailey disgustedly began to look over Lt. Kaiser's shoulder stating, "What is that all about?" in a most demeaning tone, knowing that Plaintiff was standing right there.

34.    Sgt. Bailey continued, saying "He's (Plaintiff) arguing his review", in a disapproving tone, and a heated glare at Plaintiff, obviously intent on intimidating Plaintiff for simply utilizing his right to free speech on the space provided and endorsed by the Township.

35.    Sgt. Bailey has continued to single out Plaintiff, to his detriment, as well as transferring his hostilities toward Plaintiff to his close allies, Sgt. Weimer and Sgt. Colangelo, who have become Plaintiff's direct supervisors.  The pattern of harassment was continuing.

36.    Plaintiff has never  had problems with any of his supervisors, other than Sgt. Bailey, prior to Sgt. Colangelo and Sgt. Weimer being promoted and assigned to Plaintiff's squad.

**Page <7>**

37.     The Township's Detective Bureau within the 100 person Police Department is made up of about six detectives plus two supervisors. Sgts. Bailey, Weimer, and Colangelo made up three of the six Detectives for a number of years, which fostered a close and unique relationship therein.

38.     Therefore, it became obvious to Plaintiff that Sgt. Weimer and Sgt. Colangelo would have a prior negative disposition against Plaintiff, on their own, through Sgt. Bailey, or both, for his reputation of speaking out in support of his statutory and constitutional rights.

39.     On November 18, 2012, Plaintiff closed down the NJ Transit railroad crossing on Oak Hill Road as the safety gates were malfunctioning and a train light could be seen coming from the south. This was a definite safety threat.

40.     Sgt. Bailey came to the scene and immediately began scolding Plaintiff. He ordered Plaintiff out of his patrol vehicle, screamed, "Why are you in the car and not directing traffic!", then, "Is there a train coming?", followed by "Stop being lazy and do your job!!". Sgt. Bailey did not permit Plaintiff to say a word. Plaintiff proceeded to tell Sgt. Bailey that he would obey any order he gives, but there was no need to scream at him in front of the public while he is doing his job and protecting their safety.

41.     Sgt. Bailey became enraged at Plaintiff's response and proceeded to order Plaintiff off the road into Headquarters to discipline him. In the ensuing discussion, Sgt. Bailey admitted that his judgement and his actions at the tracks were as a result of his disdain for Plaintiff for having to take a sick day due to a family health emergency four days after Superstorm Sandy had hit.

**Page <8>**

42.  Furthermore, Sgt. Bailey admitted to having "bad-mouthed" Plaintiff to others in the department about his use of the contracted benefit of the sick day, which Plaintiff was aware of, and to which Plaintiff had been simultaneously speaking out to others in the PD in defense of the inflammatory statements Sgt. Bailey was making about him. In summary, Plaintiff was again targeted for using a contracted benefit which was his to use and speaking out in defense of it.

43.  Since December 2013, Plaintiff has been the victim of direct harassment by Supervisors Weimer and Colangelo.

44.  This harassment was preceded by Supervisor Colangelo's comments to Weimer about Plaintiff, at some point after Weimer was assigned to the squad as Plaintiff's co-supervisor in November of 2013, which Plaintiff rebutted from his Performance Evaluation submitted in April 2014.

45.  Plaintiff continued in this hostile work environment until his resulting medical condition rendered him excused from duty - April 18, 2014.  Defendants' continued to raise the level of Plaintiff's discomfort, and, now they have succeeded, although Plaintiff did not quit.  Plaintiff became medically disabled.

46.  It is noted that during this time period of nearly six years, Plaintiff has helped saved lives, exhibited a fine balance of compassion and authority, and has had multiple instances of excellent performance commentary for executing such duties which have been clearly memorialized in his performance evaluations prior to these unfortunate circumstances which Supervisors Weimer and Colangelo have created.

**Page <9>**

47.    Then, with no forewarning at all, Plaintiff was told that his performance has been under a retaliatory scrutiny.

48.    This scenario was the beginning of months of dictatorial management marked by repeated abusive language, threats, taunts, inappropriate comments, and unreasonable demands. Together they formed a hostile work environment that over time became increasingly worse, severe and pervasive.

49.    On or about December 6, 2013, Plaintiff was dispatched at 3:38 a.m. to an injured deer on the roadway near Oak Hill road and Hwy 35 North. Although there was a perceived delay in Plaintiff's radio response (which Plaintiff fully and properly explained to Sgt. Weimer upon Weimer's arrival on scene) much to Plaintiff's surprise, Sgt. Weimer further told Plaintiff, "You know, you are not pulling your weight around here!"

50.    Plaintiff was confused by this as he had never been counseled nor disciplined in the past and had no indication as to why Sgt. Weimer would say this. Sgt. Weimer further stated that Sgt. Colangelo advised him that "he does not back up officers, and although he makes his own opinions on people, Plaintiff had one strike."

51.    On the night of January 1, 2014 and into the morning of January 2, 2014, Plaintiff was dispatched to investigate a Juvenile luring case. Due to the complex nature of the case and the attempted pickups and possible abduction situations, Plaintiff spent a total of two (2) hours on the call doing his job in a thorough manner given the circumstances. Plaintiff was even encouraged by Sgt. Colangelo to make sure to take good notes for his

**Page <10>**

report when he proactively called her from the scene to update her on what he was dealing with.

52.    Plaintiff was not counseled for spending too much time on the call for the balance of the shift, including when returning to headquarters after his shift, where Sgt. Weimer, Sgt. Colangelo and Lt. Kaiser were all present.

53.    During Plaintiff's following shift, he was called off the road to come into dispatch and report to the Officer in Charge (OIC) desk. Upon seeing Sgt. Weimer, Plaintiff was asked to join the Sergeant behind closed doors in the Prosecutor's Office. Sgt. Weimer proceeded to angrily and unprofessionally scold Plaintiff for the amount of time he spent on the luring call the previous day. The fact that Sgt. Weimer chose to scold Plaintiff about the necessary time he spent doing benevolent and key community policing duties involving the luring of a juvenile was quite alarming to Plaintiff.

54.    Anytime Plaintiff would try to speak of the detailed circumstances, the Sergeant would speak over him and become angrier, even cursing at Plaintiff, as well as displaying an aggressive posture. During that same meeting Sgt. Weimer aggressively questioned Plaintiff about a first aid call that he was dispatched to three days prior, after Plaintiff was already making his way to fuel up his patrol vehicle and head into headquarters after the "on the road" portion of his shift had ended. It was again obvious to Plaintiff that he was being targeted.

55.   Although Plaintiff had not done anything wrong by calling Dispatch to defer the routine first aid call to the current officer that had already been assigned the District multiple hours prior, Sgt. Weimer brought up the call in further attempt to harass, scold and intimidate him.  At the end of the meeting Sgt. Weimer had told Plaintiff, "You better remember what I said out on the road (referring to the one strike comment)! Just remember, I may be here a year or four (4) years with you, so watch yourself with me. Now get back on the road!"

56.   Following the confrontation with Sgt. Weimer, while back on the road, Plaintiff sent a text message to Lt. Kaiser, to request a meeting with him later that morning (at about 8:00 a.m.) to discuss the incident with Sgt. Weimer.  However, at 5:00 a.m. that same morning, Sgt. Weimer ordered Plaintiff to come off the road again in order to do a Special Operations Report about the morning of the first aid call.

57.   When Plaintiff arrived back at headquarters he met with Lt. Kaiser.  Plaintiff expressed his concerns regarding the meeting with Sgt. Weimer and how he was trying to further trying to intimidate him by forcing him to draft a Special Operations Report over such a small incident, but also for an incident involving no wrongdoing on Plaintiff's part.  Lt. Kaiser advised Plaintiff that he would have to do the report, but it would be handled at the squad level and that it was a non-issue.

58.   After completing the Special Operations Report, Plaintiff submitted the document to Lt. Kaiser for his review.  Lt. Kaiser reviewed and approved the report and agreed to submit

a copy with Sgt. Weimer. After returning from the road at the end of his shift, Sgt. Weimer returned to Plaintiff his submitted Special Operations Report, ordering Plaintiff to revise the document since he was asking for a report of the morning of December 30, 2013, not December 29, 2013, as to which Plaintiff wrote.

59.    Plaintiff stayed a half hour past his shift, on his own time, to make the corrections and submitted copies in both Sgt. Weimer and Lt. Kaiser's mailbox. Plaintiff sent a text to his Lieutenant to let him know that he submitted the corrections in both his and Sgt. Weimer's mailboxes. Lt. Kaiser then texted Plaintiff to try and enjoy his weekend and that he believed that Plaintiff had made an honest mistake in blending the two (2) days.

60.    At the beginning of Plaintiff's following shift, on or about Monday January 2, 2014, Plaintiff was given a sealed envelope by Sgt. Weimer. Yet again, Plaintiff was given back the Special Operations Report and told to explain what he was doing from 7:42 a.,m. when he called the desk, and 8:30 a.m. when he arrived at the OIC desk. Plaintiff decided to speak with the Sergeant in order to resolve the issue. A few words into Plaintiff's response, Sgt. Weimer stated, "you don't want to go down this road with me! We have cameras at OIC Desk, you make $100k a year do your job, check your business and back up officers!"

61.    Rather than continuing the unfounded feud that Sgt. Weimer had begun, Plaintiff then attempted to make peace with Sgt. Weimer by apologizing as if he had done something that may have offended the Sergeant. Plaintiff was perplexed as to where all this

animosity was coming from. Plaintiff then tried to shake Weimer' hand to make a sincere effort of reconciliation. Sgt. Weimer rejected this gesture by Plaintiff, and, in a heated tone, directed Plaintiff to get back on the road.

62. Due to the stress and continued anxiety of Sgt. Weimer's escalating behavior toward Plaintiff, Plaintiff took two (2) hours off at the end of his shift as Comp time, and then took off the following day as a Personal Day. During this time Plaintiff also contacted the Cop to Cop Hotline to speak with a counselor. At the onset of this, and to this day, Plaintiff continues to speak with a "Cop to Cop" counselor in order to manage his stress and anxiety issues due to his treatment at the department.

63. During Plaintiff's February 9, 2014 shift, he headed from his assigned District 5 over to the neighboring District 4 in order to back up an officer that was sent to an alarm activation at Wendy's. Upon arriving at the Wendy's, Plaintiff saw that another officer was already on scene to back up Ptl. Keller and decided not to stop as he believed it to be overkill. While stopped at a light just two lights further north on Highway 35, and about to turn around to head back towards his District, Sgt. Sweeney pulled up next to Plaintiff in his supervisor vehicle. Sgt. Sweeney calmly and understandably told Plaintiff to return to his district in case he received a call. Shortly after, Plaintiff received a radio transmission from Sgt. Weimer ordering him back to headquarters.

64. Upon arriving at headquarters, Plaintiff went to speak with Sgt. Weimer who was manning the OIC desk. Sgt. Weimer scolded Plaintiff and asked, "What is with you?

**Page <14>**

Now you can't even stay in your district." Plaintiff tried to explain himself to Sgt. Weimer but was interrupted and told, "You need to do your job, check your businesses, and back up officers!" Plaintiff once again tried to interject but was told, "That's enough of you' I'm going to start documenting this!" Weimer then picked up a phone call and Plaintiff was told by Sgt. Sweeney that he could go back on the road. Sgt. Sweeney was not upset with Plaintiff.

65.  A few weeks prior to this exchange with Sgt. Weimer, Sgt. Colangelo called Plaintiff off the road into headquarters to reprimand him for not proactively heading over to a neighboring district for a non-emergency call. Although this was the first and only time that Sgt. Colangelo expressed this concern to Plaintiff, she made certain to cite this in Plaintiff's following evaluation, citing that Plaintiff "struggles with calls for officers requesting backup" a serious allegation of Plaintiff failing to properly perform a vital duty.

66.  In summary, Sgt. Colangelo and Sgt. Weimer singled out and placed Plaintiff in a compromising position by first being reprimanded for not proactively going into a neighboring district to back up an officer on a non-emergency call which was not assigned to him, then Plaintiff was reprimanded shortly thereafter for going into a neighboring district as back up to a non-emergency call.

67.  While back on the road Plaintiff proceeded to check a few more businesses on Rt. 35 before proceeding to Poricy Park. Plaintiff normally checks parks for at least 15-20

**Page <15>**

minutes to see if anyone is there after hours, and then often time waits some time to see if anyone pulls in. After approximately 15 minutes, Plaintiff received a call on his cell phone from Sgt. Weimer who was calling from the OIC desk line. During the 24 second call, Sgt. Weimer angrily stated, "Didn't the conversation I just had with you sink in? Why haven't you moved from the same spot?!" Plaintiff tried to respond but was cut off when Sgt. Weimer yelled, "Go check your businesses!" and then hung up. It was clear that Sgt. Weimer had called from the recorded line at the OIC desk to intimidate and harass Plaintiff by making it seem as though he was disobeying orders.

68.    After the incident with Sgt. Weimer, Plaintiff again called the Cop to Cop hotline as the pressure and anxiety was building within him. He then had a conversation with Sgt. Sweeney. Sgt. Sweeney told Plaintiff to check his businesses as he normally did and that if Sgt. Weimer tried anything in the morning that he would "have his back".

69.    On April 4, 2014, Plaintiff received his most recent Performance Evaluation from Sgt. Colangelo. Plaintiff expressed his concerns and asked multiple questions of Sgt. Colangelo during their session; he then advised her that he would need some time to complete his Rebuttal. Plaintiff then informed Lt. Kaiser that he was already planning to take a personal day the next day, April 5, 2014 ,and that he would be submitting his written rebuttal to the evaluation to him as soon as possible. Lt. Kaiser told Plaintiff that it would be no problem but conveyed to Plaintiff that the front office has asked him to have all the evaluations to them by April 9th.

70.     Following a directly related sick day on April 6th, Plaintiff submitted his rebuttal and signed review within a sealed envelope, addressed to Lt. Kaiser, within Lt. Kaiser's mailbox at the beginning of his next shift on April 9, 2014.   However, Sgt. Colangelo took the envelope out of the Lieutenants mailbox and reviewed it herself.  At 1:10 a.m., Plaintiff received a call from Lt. Lenge accusing him of not moving on the GPS for an hour.  Lt. Lenge's accusations were not accurate since Plaintiff had been patrolling Route 35 checking businesses and only briefly stopped to run radar at the Bank of America to check a development on Lakeshore Drive and had just arrived from being en route to back up another officer.

71.     Plaintiff also has text message history to and from Sgt. Sweeney confirming that he was aware of Lt. Lenge's call and that the "GPS must not have been updating".  Since Lt. Lenge had not been due in until 1:30 a.m. that morning, it is believed that Sgt. Colangelo had set up Plaintiff by giving Lt. Lenge the false information in order to have him disciplined, in retaliation for writing the rebuttal.

72.     On or about April 14, 2014, Plaintiff had a session with Lt. Kaiser and Sgt. Colangelo to discuss his review Rebuttal.  Rather than a discussion of Plaintiff's review, Sgt. Colangelo used the meeting to further attack him, first by accusing him of not following chain of command, then by bringing up unrelated matters that weren't even reflected on the evaluation.

73.     On April 16, 2014 at 12:30 p.m., Plaintiff received a call from EEO Officer Veneziano. Plaintiff and Veneziano discussed his work environment and hostilities. During the discussion Veneziano informed Plaintiff that although she and Plaintiff have spoken, Acting Deputy Chief Brunt wanted a box checked in the Harassment section of the evaluation and that it would be considered insubordination if Plaintiff refused. As of April 18, 19 and 20, 2014, Plaintiff had taken either personal or sick days in order to further deal with the ongoing anxiety and stress he has been facing at the department.

74.     On April 18, 2014, Plaintiff was written out of work by Dr. Parisi (primary care MD) and referred to psychiatric counseling and psychothereapy at Stress Care of NJ, Matawan, NJ. This was now the culmination of the pattern of harassment against Plaintiff while at work, but continued thereafter as Plaintiff was rendered disabled and could not perform the duties of a police officer.

75.     Prior to this Dr. Parisi medical write out and mental health referral, Plaintiff was seen by Dr. Parisi's group since February 2014 as to the development of his work related illnesses.

76.     Plaintiff also had been calling and receiving calls from "Joe" at the "NJ Cop to Cop Hotline" as early as January, 2014 to the present regarding his work related experiences and their effect on him.

77.   In May, 2014, Plaintiff and his Counsel met with Deputy Chief Craig Weber ("Weber") and Deputy Chief Darren Schwedes ("Schwedes") for an "Internal Affairs Interview".

78.   On May 7, 2014, Plaintiff began a psychiatric evaluation and psychotherapy at Stress Care of NJ, through to present day.  He has been placed on multiple medications for depression, anxiety, and has difficulty sleeping to the present.

79.   He has seen Psychiatrists: Dr. Neelgund, Dr. Geller, and currently Dr. DeSantis.

80.   On June 12, 2014, Plaintiff received a letter from Middletown Twp./Deputy Chief Darren Schwedes, indicating that their "investigation" has resulted in the exoneration of Sgt. Weimer and Sgt. Colangelo of any wrongdoing against Plaintiff.  No other details were provided.

81.   On August 14, 2014, due to chest pains, Plaintiff visited the Monmouth Medical Center. He was admitted overnight and diagnosed with work related stress/anxiety and was strongly urged to continue his psychiatric evaluation and psychotherapy.

82.   On October 8, 2014, Plaintiff filed for Disability Retirement with the NJ Division of Pensions after 8 months of medical treatment for the illnesses caused by said harassment.

83.   His physicians' findings led to multiple diagnoses that it was not advisable for Plaintiff to return to work as a police officer any longer.

84.    In November, 2014, Dr. Geller and Dr. Parisi, filed forms with the State in support of Plaintiff's Disability Retirement application, attesting, in writing, that he is permanently disabled from his duties as a Police Officer with diagnoses of Major Depressive Disorder, PTSD, Panic Disorder, elevated blood pressure and marked weight gain.

85.    Additionally, Monmouth Medical Center forwarded Plaintiff's medical records from his work related stress/anxiety attack of August 14, 2014.

86.    On February 25, 2015, Plaintiff received notice from Middletown's Assistant Administrator, James Van Nest ("Van Nest"), indicating that the Township was canceling his and his family's health insurance coverage as of February 28, 2015, with only three days' notice, again placing Plaintiff in a very compromising position.

87.    On July 22, 2015, Dr. DeSantis filed updated medical documentation in further support of Plaintiff's Disability Retirement application, stating that Plaintiff is permanently disabled from his duties as a Police Officer with diagnoses of Major Depressive Disorder, PTSD, and Panic Disorder.

88.    On October 19, 2015, Plaintiff appeared before the Pension Board.  The Board voted "no" as to Plaintiff's disability pension application.  The Board simply deferred to the Medical Report of Dr. Filippone, the State's Physician.

89.    On October 20, 2015, Plaintiff became suicidal and was admitted to the Monmouth Medical Center Psychiatric Hospital for 3 nights.  The Long Branch PD found Plaintiff by

**Page <20>**

the railroad tracks through the life-saving phone skills of Officer Hartsgrove, Highlands PD.

90.    Upon discharge, all of Plaintiff's weapons and his Firearm's Permit had been seized per Monmouth County Law Enforcement protocol in Psychiatric matters.

91.    On November 23, 2015, Plaintiff's Psychotherapist, Al Malik-Jenkins, submitted a letter refuting the misquoting of his conversation with IME Dr. Filippone on June 6. 2015.

92.    On November 25, 2015, Dr. DeSantis submitted yet another current medical examination form to the NJ Division of Pensions. On same date, Dr. DeSantis submits medical document excusing Plaintiff from the inappropriate and unnecessary "Fitness For Duty" exam the Township scheduled for him since Plaintiff has already been diagnosed as "not fit for duty and permanently disabled from his duties as a police officer" on multiple occasions and has filed for disability retirement accordingly.

93.    From November 30, 2015, to the present, Plaintiff has filed an extensive and detailed Pension Appeal, which has now been forwarded to the Office of Administrative Law.

94.    Within the State's Discovery packet sent on March 18, 2016 was a Pensions Fraud Unit report including false slanted statements made by the Township and it's agents such as the allegation of Plaintiff "demanding" holidays off, the trivialization of his mother's severe illnesses in relation to Plaintiff's motive to speak out for and use his contracted benefits, irrelevant and disturbing quotations such as "to our knowledge she is still alive",

**Page <21>**

allegations of extortion on the part of Plaintiff's attorney, among many other half-truths and misrepresentations of fact.

95.    Also included are allegations of wrongdoing regarding Plaintiff's ministerial role as a horse trainer, a business that has been part of Plaintiff's family for two generations. This personal harassment is now a means to an end to not only eliminate Plaintiff's employment, but now his pension.

96.    Plaintiff's minimal involvement with horses and, for that matter, mostly his own horse and has no bearing on the fact that Plaintiff has been specifically rendered mentally unable to perform the duties of a police officer any longer due to the actions of Middletown Township and it's agents. Plaintiff has not claimed physical disability nor any other disability that would render his involvement with horses as fraudulent in relation to his filing for disability retirement. This unrelated matter was brought up by the Township to illustrate alleged impropriety regarding Plaintiff's filing for an Ordinary Disability retirement with the NJ Division of Pensions, thus purposefully attempting to spark a denial of Plaintiff's disability pension, which is much less than the standard pension Plaintiff would have deservedly received had he been able to complete twenty years of service.

97.    The discriminatory and harassing motives of Middletown and its agents, coupled with its negligent misrepresentations, in addition to the tortious interference with Plaintiff's

**Page <22>**

economic gain, and attempted constructive discharge, have caused Plaintiff and his family great harm that will be very difficult to recapture. The above clearly points to a pretextual attempted termination. Plaintiff has a right to seek redress for the violation of his constitutional and statutory rights.

98. Plaintiff's initiation of complaints and grievances for wrongful acts against him, as well as statements to his superiors about the improper and unlawful conduct of fellow public employees was and is speech and conduct protected by the First Amendment to the **United States Constitution** and other non-cited legal claims at this point in time.

99. As a consequence of and in retaliation for Plaintiff's 's association and acts and statements therein, and continuously thereafter, up to and including his last active date prior to his medical leave of absence, and even thereafter, the Township and its agents, acting individually and in concert and/or in conspiracy together and at all times under color of state law, have unlawfully, intentionally, and maliciously engaged in an unlawful and unjustified course of conduct and/or pattern of activity, with the intent to cause Plaintiff to suffer adverse actions and to force Plaintiff to leave his employment with Middletown, to stifle and chill Plaintiff's future exercise of freedom of speech and association, to subject Plaintiff to unrelenting mental and physical harassment so long as he remained an officer, and to damage the reputation of Plaintiff in the community as a good citizen and a good officer.

**Page <23>**

100.    Conduct engaged in by the Township and its agents, in addition to the above, acting individually and in concert and/or conspiracy together and at all times under color of state law, includes:

   a.    Plaintiff was the subject of unwarranted abuse and harassment in that his name was coupled with derogatory comments and language by the Township and its agents.

   b.    Threats have been made upon Plaintiff, whereby others would not associate with him based upon the actions of the Township and its agents.

   c.    Plaintiff was victimized by terrible assignments and tasks, while others enjoyed preferred assignments and benefits.

101.    The Township and its agents, despite their knowledge of, and in some cases their participation in, the harassment and unlawful treatment that Plaintiff was and still is being subjected to, failed to take any steps to prevent this conduct and, in fact, tolerated, permitted and/or participated in the aforementioned pattern of behavior with knowledge thereof.

102.    At no time during the months of harassment that Plaintiff has suffered has the Township and its agents, despite their actual knowledge of the existence of the harassment and the retaliatory conduct of themselves and other officers, taken any steps to prevent the harassment from taking place, nor at any time have any of the agents punished or

**Page <24>**

disciplined in any way for any acts of harassment they have carried out, even though many of those acts have amounted to violations of the laws stated herein as well as the policies and procedures of the Township.

103. The Township policymaking and supervisory officials have instituted no training, issued no written directives or instructions, and implemented no specific supervisory procedures to prevent the harassment and infliction of personal injury on Plaintiff.

104. By its failure to take any steps to protect Plaintiff from the harassment he has been subjected to, and by its failure to take any steps to punish those responsible for this harassment, the Township, and its agents, despite their actual knowledge of the existence of the harassment and participants in the retaliatory conduct, have, by their acts and omissions, ratified the unconstitutional conduct and encouraged the continuation of this harassment to the present day.

105. The aforementioned conduct of the Township and its agents was intentional, malicious, willful, wanton, in reckless disregard of, or grossly negligent to Plaintiff's constitutional rights in that such conduct shocks the conscience, is offensive to human dignity, offends even the most hardened sensibilities, and is fundamentally offensive to a civilized society.

106. The fact that the Township and its agents' unrelenting campaign of harassment of Plaintiff, premised as it was on Plaintiff's exercise of his protected rights, and motivated by a desire to punish Plaintiff for that exercise, was done under color of state law, by

**Page <25>**

individuals in authority and sworn to uphold the law, constitutes as well conduct that shocks the conscience.

107.   As a result of the Township and its agents' conduct, Plaintiff has suffered, among other things, the following specific, objective injuries:

a.   The chilling of Plaintiff's 's right of speech in that the Plaintiff had been deterred from reporting further incidents.

b.   The chilling of Plaintiff's right of association in that he has been deterred from associating with law abiding citizens for the sole reason that his association has been utilized by the Township and its agents as the basis for subjecting Plaintiff to harassment and personal injury.

108.   Plaintiff's initiation of complaints and grievances for the wrongful acts against him, as well as statements to his superiors about the improper and unlawful conduct of fellow public employees was and is speech and conduct protected by the First Amendment to the **United States Constitution.**

109.   As a consequence of and in retaliation for Plaintiff's association and acts and statements therein, and continuously thereafter, up to and including the date of the filing of this complaint, the defendants herein, and others known and unknown, acting individually and in concert and/or in conspiracy together and at all times under color of state law, have unlawfully, intentionally, and maliciously engaged in an unlawful and unjustified course

**Page <26>**

of conduct and/or pattern of activity, with the intent, <u>inter alia</u>, to cause the plaintiff to lose his employment or to force the plaintiff to leave his employment with Middletown, to stifle and chill plaintiff's future exercise of freedom of speech and association, to subject plaintiff to unrelenting mental and physical harassment so long as he remained an officer, and to damage the reputation of plaintiff in the community as a good citizen and a good officer.

110.    Defendants, despite their knowledge of, and in some cases their participation in, the harassment and unlawful treatment the plaintiff was and still is being subjected to, failed to take any steps to prevent this conduct and, in fact, tolerated, permitted and/or participated in the aforementioned pattern of behavior with knowledge thereof.

111.    As a direct and proximate result of the defendants' retaliation and punishment of the plaintiff for his exercise of First Amendment rights, the plaintiff has been chilled or deterred from further exercise of those rights. This includes, but is not limited to, the fact that the plaintiff, has been continually ostracized and harassed by the Township.

112.    As a direct consequence and proximate result of the conduct of the defendants as described above, the plaintiff has been subjected to a deprivation, under color of state law, of his constitutional rights, including his rights under the **First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution**, as guaranteed and

**Page <27>**

protected by 42 **U.S.C.** 1983, 1988, and of his rights as guaranteed by the **Constitution** and statutes of the State of New Jersey.

113.   As a direct consequence and proximate result of the conduct of the defendants as described above, plaintiff has suffered irreparable damage, severe emotional and psychological distress, anguish, anxiety and injury, pain and suffering, and damage to his reputation and character due to the willful, wanton and deliberate conduct of the defendants.

## *COUNT ONE*

114.   The plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 113 as if fully set forth herein.

115.   The conduct of the defendants, acting under color of state law, in retaliating against and punishing the plaintiff for his exercise of his **First Amendment rights**, which has both chilled and deterred him from the unfettered exercise of his rights and caused and continues to cause him specific, objective harm, were done intentionally, willfully, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful justification, and were designed to and intentionally cause the Plaintiff severe emotional and psychological distress, anguish, anxiety and injury, pain and suffering, property damage and property loss, and damage to reputation and character, as well as an attempted constructive discharge, in violation of the

**Page <28>**

Plaintiff's Constitutional rights as guaranteed under **42 U.S.C. 1983**, and the **First and Fourteenth Amendments to the United States Constitution.**

## *COUNT TWO*

116.    Plaintiffs reiterate and incorporate by reference the allegations in Paragraphs 1 through 115 as if fully set forth herein.

117.    The conduct of the defendants, acting under color of state law, in retaliating against and punishing the plaintiff for his exercise of his First Amendment rights, which has both chilled and deterred him from the unfettered exercise of his rights and caused and continues to cause his specific, objective harm, amounts to conduct that is shocking to the conscience and that offends human dignity, and was done intentionally, willfully, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful justification, and were designed to and did intentionally cause the plaintiff severe emotional and psychological distress, anguish, anxiety and injury, pain and suffering, property damage and property loss, and damage to reputation and character, as well as an attempted constructive discharge, in violation of the plaintiff's Constitutional rights as guaranteed under 42 **U.S.C.** 1983, and the **Fifth and Fourteenth Amendments to the United States Constitution.**

## *COUNT THREE*

118.   The plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 117 as if fully set forth herein.

119.   The conduct and actions of defendants, acting under color of state law and in concert with one another, violated plaintiff's rights under 42 **U.S.C.** 1983 and the **First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution**. These defendants conspired to deprive the plaintiffs of the aforementioned rights by conspiring to harass and retaliate against the plaintiff for the plaintiff's exercise of protected First Amendment rights of speech and association.

120.   In furtherance of this conspiracy, one or more of the defendants participating therein did or cause to be done a number of covert acts, all in effort to retaliate against him.

121.   As a direct and proximate result of the defendants' actions, plaintiff suffered injury to his person and property and was deprived of his rights under 42 **U.S.C.** 1983 and the **First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.**

### *COUNT FOUR*

122.   The plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 121, as if fully set forth herein.

123.   At all times relevant to this complaint, the County and the individual defendants were under their direction and control. The individual defendants, whom at all times relevant

**Page <30>**

to this complaint, were responsible for promulgating policies and practices for the County.

124.  At all times relevant to this complaint, the individually named defendants, were ultimately responsible for the instruction, supervision, control and discipline of officers for the Department.

125.  Upon the occurrences, the individual defendants, participated in, and was informed of the unlawful and continued harassment.  On information and belief, the individual named defendants conveyed this information and other confidential and damaging information regarding plaintiff to other members of the Department.

126.  Between the initiating of acts against plaintiff and the present, there has been no non-biased investigation of conduct against plaintiff by anyone having authority to do so within the Department.

127.  No formal or informal disciplinary action was taken against any officer by any authority, nor were any steps taken to protect the plaintiff from this harassment or retaliation for his having exercised his First Amendment rights, nor were any steps taken to prevent the defendant officers from engaging in future acts of harassment and retaliation against the plaintiff.

128.  The failure of defendants to take steps to prevent the plaintiff from being subjected to harassment and retaliation, to thoroughly investigate who was responsible for the

**Page <31>**

harassment and retaliation, and/or to take action against those who were responsible for the harassment and retaliation, amounted to a ratification of this harassment by these defendants and an encouragement to those who were responsible that they could continue to harass and retaliate against the plaintiff without fear of being sanctioned in any way for their unjustified and illegal behavior.

129.    In effect, defendants created, authorized, maintained, permitted and enforced a policy, practice, custom or usage of failing to properly instruct, supervise, control and discipline members of the Department.

130.    The failure of defendants to diligently exercise their duties to instruct, train, supervise, control and discipline members of the Department constituted deliberate indifference to the plaintiff's constitutional rights, and was and is a direct and proximate cause of the injuries that he has suffered and continues to suffer today.

131.    Pursuant to the aforementioned customs, policies, practices and usages, the defendants, directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless and wanton conduct of defendant's officers as heretofore described.

132.    As a direct and proximate result of the acts and omissions of the defendants, the plaintiff has been subjected to the deprivation of rights, privileges and immunities secured to him by the **First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution** and 42 **U.S.C.** 1983.

**Page <32>**

133.   As a direct and proximate result of the aforesaid acts and omissions of the defendants, the plaintiff has suffered severe emotional and psychological distress, anguish, anxiety and injury, pain and suffering, and damage to his reputation and character.

## *COUNT FIVE*

### *Intentional Infliction of Emotional Distress*

134.   Plaintiff repeats and realleges the facts contained in paragraphs 1-133, as if fully set forth herein at length.

135.   The conduct of the defendants was extreme and outrageous against the Plaintiff and continues to cause him specific, objective harm, and was done intentionally, willfully, maliciously and recklessly, without lawful justification, and was designed to, and intentionally did, cause the Plaintiff severe emotional and psychological distress, anguish, anxiety and injury, pain and suffering, and damage to his reputation, career, professional standing and character.

## *COUNT SIX*

### *Retaliation*

136.   Plaintiff repeats and realleges the facts contained in paragraphs 1-135, as if fully set

forth herein at length.

137.   The actions of Defendants are clearly in retaliation to the conveyances, accomplishments and achievements of Plaintiff in violation of public policy.

138.   As a result thereto, Plaintiff has sustained damages.

**WHEREFORE,** the plaintiff demands the following relief jointly and severally against all of the defendants:

A.   An award of compensatory damages generally against the defendants, and each of them jointly and severally.

B.   An award of punitive damages against the defendants, with the exception of the defendant, Middletown Township, and each of them jointly and severally.

C.   A declaration that the aforementioned actions of the defendants are unconstitutional and in violation of the United States and New Jersey statutory law.

D.   A court order granting a permanent injunction against the defendants, and all persons in active concert and participation with them, from the commission or omission of any of the aforesaid unlawful acts or any similar acts against plaintiff, and that the defendants take such action as may be necessary to prevent future commission or omission of any of said unlawful acts against plaintiff.

E.   The convening and empaneling of a jury to consider the merits of the claims herein.

**Page <34>**

F. A court order that the plaintiff is entitled to the costs involved in maintaining this action, including attorneys' fees.

G. Such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Respectfully submitted,

**WILLIAM F. KOY, ESQ.**

**LAW FIRM OF WILLIAM KOY, L.L.P.**

**Attorneys for Plaintiff**

Dated:   April 12, 2016

## Assignment of Trial Counsel

William F. Koy, Esq. and William J. Koy, Esq. are hereby assigned as trial counsel.

## <u>VERIFICATION</u>

### I DECLARE THAT:

I am the plaintiff in the above entitled action. I have read the foregoing Complaint and know the contents herein. This is true of my own knowledge, except as to those matters which are therein stated upon my information and belief, and as to those matters, Plaintiff believes them to be true.

Plaintiff declare under penalty of perjury that the foregoing is true and correct and that this verification is executed this _13th_ _day of April, 2016._

_____

Savino Capilupi, Plaintiff

## Email Scan Verification

I Certify that Savino Capilupi was not available to sign this document. The above is filed with a facsimile of his original signature and I certify that the affiant acknowledged to me the genuineness of the signature and that the document or a copy with an original signature affixed will be filed if requested by the Court or a party.

_____
WILLIAM F. KROY, ESQ.

Dated: April 13 2016